## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| ALONZO MORRIS, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | Civ. No. 12-1720-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Karen Y. Vicks, Esquire of Law Office of Karen Y. Vicks, LLC.  Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration.  Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III and Maija DiDomenico, Esquire, Assistant Regional Counsel of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania.  Counsel for Defendant.

## MEMORANDUM OPINION

Dated: February 26, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Alonzo Morris ("plaintiff") appeals from a decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("defendant"), denying his application for Disability Insurance Benefits ("DIB") and supplemental security income (SSI) under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434, 1381-1383f. The court has jurisdiction pursuant to 42 U.S.C. § 405(g).[1]

Currently before the court are the parties' cross-motions for summary judgment. (D.I. 15, 20) For the reasons set forth below, plaintiff's motion will be denied and defendant's motion will be granted.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed applications for DIB and SSI on March 8, 2002,[2] alleging disability beginning on March 18, 2001,[3] due to "bipolar disorder, attention deficit disorder inattentive type, arthritis left hip." (D.I. 15 at 46, 534-36, 673) On November 21, 2006, after a hearing on August 23, 2006 ("the 2006 hearing"), the ALJ issued a partially favorable decision ("the 2006 decision"), finding that plaintiff became disabled on April

---

[1]Under § 405(g), [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision. . .. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides .... 42 U.S.C. § 405(g).

[2]Plaintiff previously applied for DIB; the application was denied at the reconsideration level in March 1999 and plaintiff did not appeal. (D.I. 15 at 41, 44)

[3]Plaintiff originally alleged his alleged disability onset date as February 15, 1997, but amended it to correspond to the diagnosis of his hip impairments. (D.I. 15 at 46, 673)

17, 2006. (*Id.* at 4-6, 14-21, 27-30) After an unsuccessful appeal to the Appeals Council (*id.* at 4-6), plaintiff appealed to the United States District Court (*id.* at 488-89), which remanded the case for further administrative proceedings (*id.* at 490-512). After another hearing, the ALJ issued another partially favorable decision on May 28, 2010 ("the 2010 decision"), finding that plaintiff was disabled from March 18, 2001 through November 1, 2003, and then again beginning on April 17, 2006.[4] (*Id.* at 581-96)

Plaintiff again appealed. The Appeals Council vacated the 2010 decision and remanded the case for further review because the recording of the hearing could not be located. (*Id.* at 472, 597-99) After a third administrative hearing, the ALJ issued another partially favorable decision on January 19, 2012 ("the 2012 decision"),[5] finding again that plaintiff was disabled from March 18, 2001 through November 1, 2003, and then again beginning on April 17, 2006. (*Id.* at 472-87) Plaintiff unsuccessfully sought review by the Appeals Council. (*Id.* at 450-53) On December 17, 2011, plaintiff filed the current action for review of the 2012 decision. (D.I. 15)

## B. Medical History

### 1. Hip replacement

Plaintiff underwent a left total hip replacement on July 22, 2003 after a history of left hip osteoarthritis. (D.I. 15 at 207-08, 215-16, 313-18) On August 11, 2003, plaintiff's primary care physician, Domingo G. Aviado, M.D. ("Dr. Aviado"), noted plaintiff

---

[4]Plaintiff was last insured on June 30, 2001. (D.I. 15 at 41, 554).

[5]The 2012 decision incorporates plaintiff's testimony at both previous hearing as summarized in the ALJ's 2006 and 2010 decisions, as well as the medical evidence described in the 2010 decision.

was doing "fairly well" after his hip replacement. (*Id.* at 200) On September 4, plaintiff complained to Dr. Aviado of "muscle spasm[s] especially in left leg," with pain in the "left calf, ankle and foot." (*Id.* at 199) On September 10, 2003, at six weeks post-operative, plaintiff followed up with orthopedic specialist Wilson Choy, M.D. ("Dr. Choy"). Treatment notes indicate that plaintiff reported he was "doing very well now and [was] pleased with the results." (*Id.* at 206) Plaintiff was no longer taking Oxycontin, got up early in the morning to get dressed, and "[t]his [was] the best that he has felt in 10 years." (*Id.*) Dr. Choy observed "excellent" left hip range of motion, and left hip x-rays revealed a well fixed prosthesis. (*Id.*) Dr. Choy referred plaintiff to physical therapy, recommended aquatic therapy and exercises to work on plaintiff's iliopsoas muscles, prescribed Celebrex and Vicodin, and advised activity as tolerated. (*Id.*)

On November 21, 2003, approximately four months post hip replacement, Dr. Choy's notes indicate that plaintiff was doing "very well," was no longer taking any narcotic pain medication, and was "walking well with no assistive device." Plaintiff had some pain in his left groin and walked with a "little limp." (*Id.* at 205) Plaintiff had excellent passive hip range of motion, full leg extension, and no pain to the thigh or groin with knee strike. (*Id.*) Dr. Choy again recommended aquatic therapy, but prescribed no medications and advised activity as tolerated. (*Id.*)

On January 14, 2004, plaintiff was doing "very well" and his tendinitis was improving. (*Id.* at 302) An examination revealed "no pain at all" for passive left hip range of motion, no thigh or groin pain with knee strike, and some groin pain and tenderness along the iliopsoas tendon. The x-rays showed a well fixed femoral and

3

acetabular implant in excellent alignment. (*Id.*) Dr. Choy recommended stretching the iiopsoas muscle with warm compresses, did not prescribe any medication and advised activity as tolerated. (*Id.*)

On March 16, 2004, plaintiff consulted Dr. Aviado for a cold and cough. Dr. Aviado noted that plaintiff "[s]till [had] difficulty ambulating with [l]eft hip" and plaintiff requested that Dr. Aviado complete a state disability form. (*Id.* at 195) Dr. Aviado indicated on the disability form that plaintiff had left hip surgery in 2003 and was unable to work because of "hip arthritis, asthma, and [hypertension]." (*Id.* at 204) Plaintiff consulted Dr. Aviado for other medical issues on April 12, 2004, May 3, 2004, and June 29, 2004, and did not complain of issues or pain with his hips. (*Id.* at 192-95)

On June 30, 2004, Dr. Choy noted plaintiff was doing "very well," and his groin pain was "much improved." (*Id.* at 300) Plaintiff was able to achieve full leg extension and had "no pain at all to the thigh or groin with knee strike." (*Id.*) Plaintiff's x-rays revealed "excellent" ingrowth of the left hip prosthesis. (*Id.*) Dr. Choy prescribed no medications, advised that no further intervention was required, and recommended a follow-up in one year. (*Id.*)

On January 12, 2005, plaintiff reported "excruciating" hip pain at the Veterans Affairs Medical Center (VA). (*Id.* at 401) Treatment notes indicate the pain was actually in the lower back and plaintiff had shooting pain down the back of his leg. (*Id.*) On physical examination, plaintiff exhibited pain in his left groin, low back, and leg when performing a straight leg raise. (*Id.* at 402) The physician ordered x-rays. (*Id.*)

On March 29, 2005, state agency physician Vinad Katareo, M.D. ("Dr. Katareo")

4

reviewed the record and opined that plaintiff retained the ability to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours and sit for about six hours during an eight-hour workday; push and pull consistent with his lifting and carrying abilities, except for the operation of foot controls with his left leg; occasionally climb, balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to extreme cold, vibration, pulmonary irritants, and hazards. (*Id.* at 364-71) According to his Function Report form completed on March 8, 2005, plaintiff prepared frozen meals, cared for his personal needs, drove, rode in a car, walked (but "not far"), used public transportation, shopped in stores, spent time with others, and did not use a cane or other assistive device. (*Id.* at 82-88)

X-rays taken on August 11, 2005 revealed "[m]ild degenerative hypertrophic spurring involving all of the lumbar vertebral bodies," and an intact hip prosthesis with no evidence of loosening. (*Id.* at 397-98) On that date, plaintiff was fitted for a straight cane. (*Id.* at 391-92)

On October 24, 2005, during a VA visit, plaintiff reported a history of chronic low back pain for several years, which he treated with a heating pad, Tylenol, and balm. (*Id.* at 387-88) Plaintiff did not do his back exercises, as he was afraid of hurting his back. (*Id.* at 388) On physical examination, plaintiff had limited lumbar spine range of motion, but a negative straight leg raising test, full motor strength throughout, intact sensation, and symmetric reflexes. (*Id.*) Plaintiff was ambulating independently. (*Id.*) The VA physician provided instructions for simple back stretching exercises and ordered a back brace at plaintiff's request. (*Id.* at 387-88)

5

On February 22, 2006, a lumbar spine CT scan revealed disc bulging at L3-4 and L4-5 with no focal disc herniation, mild bilateral facet joint degenerative changes from L3-4 through L5-S1, and no evidence of spinal stenosis. (*Id.* at 381) On March 21, 2006, plaintiff was issued a cane. (*Id.* at 377)

On November 12, 2009, Jay Freid, M.D. ("Dr. Freid") evaluated plaintiff at the request of the state agency. (*Id.* at 564-76) Plaintiff reported that he had hip pain, but took no medications for it. (*Id.* at 564) He continued to smoke a pack of cigarettes every two days despite his diagnosis of chronic obstructive pulmonary disease ("COPD"). (*Id.*) On examination, plaintiff walked slowly without an assistive device and exhibited full (5/5) motor strength in his arms and legs, normal sensation in his legs, good range of motion in all joints and both hips, and only mild pain with left hip movement. (*Id.* at 565) Dr. Freid noted that plaintiff seemed to be "subjectively limited with more physical activities." (*Id.*) Dr. Freid opined that plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit for eight hours, stand for two hours, and walk for one hour during an eight-hour day, with additional postural and environmental restrictions; only occasionally reach with either arm; and should never perform postural activities, like balancing, kneeling, or stooping. (*Id.* at 571-76)

## 2. Pulmonary issues

Plaintiff has a history of sinus issues. (*Id.* at 192-201) Through June 2004, Dr. Aviado treated plaintiff for chronic sinusitis and prescribed medication, including a bronchodialator on March 16, 2004.[6] (*Id.* at 192-201) Starting in October 2004, plaintiff

---

[6]Plaintiff points out that on October 15, 2003, Dr. Aviado noted "occasional wheez[ing and a] harsh cough;" plaintiff was diagnosed with acute bronchitis on that

6

received treatment for his sinusitis and pulmonary complaints either from another primary care physician or an Ear, Nose, and Throat specialist at the VA. (*Id.* at 233-34, 250-51, 376-77, 379-84, 411) At various times, plaintiff was assessed with chronic smokers rhinosinusitis and COPD, prescribed medication and bronchodilator therapy, and advised to quit smoking. (*Id.* at 376-77, 382, 402, 412) Physician notes indicate plaintiff smokes at least a half-pack of cigarettes daily. (*Id.* at 233) Plaintiff participated in several smoking cessation programs, which were unsuccessful. (*Id.* at 379 (indicating plaintiff failed to attend a smoking cessation visit), 400-01, 403, 409)

Plaintiff underwent several diagnostic studies during the relevant period. On October 29, 2003, x-rays of plaintiff's paranasal sinuses were negative. (*Id.* at 213) On March 19, 2004, plaintiff underwent a pulmonary function study and Dr. Aviado diagnosed COPD. (*Id.* at 211) On November 30, 2004, sinus x-rays revealed bilateral frontal and bilateral ethmoid sinusitis. (*Id.* at 250, 252) On January 9, 2005 a pulmonary physician at the VA diagnosed plaintiff with mild obstructive airways disease after testing on December 17, 2004. (*Id.* at 234) On March 23, 2006, a maxillofacial CT scan revealed mild to moderate thickening in plaintiff's sinuses. (*Id.* at 378)

## C. Administrative Hearing

### 1. Plaintiff's testimony

An administrative hearing was held on November 15, 2011. (*Id.* at 702-03) Plaintiff appeared, represented by counsel. Plaintiff was born on April 17, 1951 and was sixty on the date of the hearing. (*Id.* at 706) He is divorced and has adult children.

_____

date. (*Id.* at 198)

7

(*Id.* at 706, 716) He lives by himself and does housework when he is able. (*Id.* at 713, 720-21) He has a driver's license, but does not drive a lot. (*Id.* at 706-07) He completed ninth grade and obtained a GED. (*Id.* at 707) He took some college courses (including asbestos courses) for two years at the University of Delaware and DelTech. (*Id.* at 715-16) He served in the military from 1968-70. (*Id.* at 707) He wears glasses to read. (*Id.* at 721)

His past work history included welder, painter, asbestos removal, and shipping and receiving. (*Id.* at 708) He has not worked since 1998, when he worked doing maintenance for Dunkin Donuts for a week. (*Id.* at 707-08) He draws a VA pension of approximately \$985 per month,[7] but does not recall drawing workmen's compensation or unemployment. (*Id.* at 716-17, 720)

Prior to his hip surgery, plaintiff testified he had arthritis and could barely walk. (*Id.* at 708-09) He could only lift about three to five pounds, as he could not bend or squat. (*Id.* at 717-18) He could not stand or sit for longer than about twenty minutes, before starting to get pain. (*Id.* at 718-19) He could not walk more than a block. (*Id.* at 718) He used a cane. (*Id.* at 722) He did not injure his back, however, it started hurting at the same time as his hips began hurting. (*Id.* at 723)

Plaintiff had his left hip replaced in 2003. (*Id.* at 708-09) He testified that he improved somewhat after surgery, he was a little better, but still had problems walking long distances or staying on his feet. (*Id.* at 709) He could continuously walk for about twenty minutes. (*Id.* at 709-10) He was still only able to walk about a block. (*Id.* at

---

[7]It is unclear from the testimony when plaintiff began drawing the pension.

8

720) He could not sit for long. (*Id.* at 720) He had back problems and problems sitting for long periods. (*Id.* at 710) He has to keep moving from side to side and move around while sitting. (*Id.* at 712) Post surgery, he was instructed to not lift over ten or twenty pounds. (*Id.* at 712) His hip and back pain were about a six on a scale of one through ten. (*Id.* at 712-13) He was on pain medication, but now takes over-the-counter medication. (*Id.* at 711, 719) He was sometimes able to sleep through the night. (*Id.* at 713) He continued to use a cane post-surgery. (*Id.* at 722) He does not recall when he was given a back brace, but continues to use it. (*Id.* at 722-23) He has not had any hospitalizations or emergency room visits recently for his conditions (*id.* at 711, 721), although he also has issues with his right hip and needs surgery. (*Id.* at 710)

He was diagnosed with bipolar disorder in the 1980s and received some treatment. (*Id.* at 710, 719) He testified he had no problems with alcohol and has not been arrested for drugs or alcohol. (*Id.* at 719)

When asked about a typical day after hip surgery, plaintiff testified he went to "rehab" in the morning, watched a lot of TV and read. (*Id.* at 713-14) He testified that his improvement after surgery was pain related. (*Id.* at 714) His pain went from a ten to twelve before surgery, to less severe after surgery. (*Id.*) He did not feel that he could have handled a job which required standing for most of the day, as the doctor told him no prolonged standing and his hip was only guaranteed for ten years. (*Id.* at 714-15) He could no longer perform hands-on jobs. (*Id.* at 715)

### 2. VE's testimony

At the hearing, the VE testified that plaintiff's vocational background consisted of

9

work as a painter, a welder, and asbestos worker, which are at a heavy exertional level

with a special vocational preparation ("SVP") of 2. (*Id.* at 724-25)  The VE opined that

there were no transferrable skills to a lower level of exertion. (*Id.* at 728)

The ALJ posed the following to the VE:

> I would like for you to assume a hypothetical of a person
> who's 49 years of age on his alleged onset date, has a 12th
> grade education, plus a couple of years of asbestos
> teaching at the college, no certificate however.  Past
> relevant work as just indicated, and right-handed by nature.
>     Suffering from degenerative disk disease in 2006 at
> the L3-4-5 level.  He had a hip replacement in 2003, in July
> and had back then according to his testimony some
> depression with a bipolar component and/or attention deficit
> disorder by record.
>     And he had his hip replacement as indicated in 2003
> with improvement.  But he did have some pain and
> discomfort and depression, moderate in nature.  The file
> indicates perhaps some personality disorder, and all of
> which were somewhat relieved by his medications without
> significant side effects.
>     And if I find at that time that he was moderately
> limited in his ability to perform his ADLs and to interact
> socially and to maintain his concentration, persistence and
> pace, all due to his depression and pain, and as a result
> thereof would need to have some simple, routine, unskilled
> jobs, Ms. Cody, SVP one or two in nature, you can explain
> what that means.
>     He was able to attend tasks and complete schedules
> and still is.  Jobs that were low stress, low concentration, low
> memory.  By that I mean jobs that are one or two-step tasks.
> No production rate pace work.  Jobs that had little interaction
> with the public, coworkers or supervisors.  Jobs that would
> allow him to deal with things rather than people during the
> period in question.
>     And jobs that wouldn't have decision[ ]making or
> changes in work setting or judgment to perform the work due
> to his depression and pain.  And if I find that he could have
> lifted 10 pounds frequently, 20 on occasion, could have
> stood for 20 or 30 minutes, sit for 20 or 30 minutes
> consistently on an alternate basis, however, eight hours a
> day, five days a week.  Would need to avoid heights and

10

> hazardous machinery due to his hip.
>       All subject to the usual and customary breaks during
> a normal work day.  No prolonged climbing, balancing and
> stooping, and by that I mean no more than once or twice an
> hour.  Jobs that would allow him to avoid stair climbing,
> ropes, ladders and like devices due to his condition.  With
> those limitations, would have been able to do some
> sedentary only work activities.  Can you give me jobs such a
> person could do in significant numbers?

(*Id.* at 725-27)  The VE responded: "Yes, Your Honor. . . . [a]t the light exertional level,[8]

a position as an inspector . . ., a filler, . . . hand bander . . . .  At the sedentary exertional

level,[9] a position as a dial marker . . ., bench hand . . . , [and] table worker . . . ."  (*Id.* at

---

[8]The Social Security Regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time
> with frequent lifting or carrying of objects weighing up to 10
> pounds. Even though the weight lifted may be very little, a
> job is in this category when it requires a good deal of walking
> or standing, or when it involves sitting most of the time with
> some pushing and pulling of arm or leg controls. To be
> considered capable of performing a full or wide range of light
> work, you must have the ability to do substantially all of
> these activities. If someone can do light work, we determine
> that he or she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine dexterity or
> inability to sit for long periods of time.

20 C.F.R. § 404.1567(b)

[9]The Social Security Regulations define sedentary work as follows:

> Sedentary-work involves lifting no more than 10 pounds at a
> time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools. Although a sedentary job is
> defined as one which involves sitting, a certain amount of
> walking and standing is often necessary in carrying out job
> duties. Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

11

727-28) On cross-examination, the VE was asked:

> Going back to the hypothetical number one with the sit/stand
> option. If the sit/stand option, which I believe was defined as
> 20 to 30 minutes at a time sitting, 20 to 30 minutes at a time
> standing, if the whole reason for having that sit/stand option
> was because of pain and the person was needing to
> alternate between the positions because of that and they
> were going to need an off-task break of about ten minutes or
> so, would that person be able to do any work?

(*Id.* at 728-29) The VE responded, "[n]o. That amount of breaks would be excessive in

the employer's opinion and would certainly preclude any type of employment." When

asked about the impact of using a cane, "necessary for pain and for balance," the VE

opined that it would preclude the light positions. (*Id.* at 729)

## D. The ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VE, the ALJ

determined that the plaintiff was not disabled from November 1, 2003 through April 17,

2006. (*Id.* at 486) The ALJ's findings are summarized as follows:[10]

1. The claimant last met the insured status requirements of the Act on
June 30, 2001.

2. The claimant has not engaged in substantial gainful activity since
March 18, 2001, the date claimant became disabled (20 C.F.R. §§
404.1520(b), 404.1571 et seq.).

3. Plaintiff was under a disability from March 18, 2001 through October
31, 2003 as defined by the Act (20 CFR 404.1520(g)), and had the
following severe impairments: degenerative disc disease, bilateral
osteoarthritis of the hips with July 2003 total left hip replacement, chronic
obstructive pulmonary disease, bipolar disorder, attention deficit
hyperactivity disorder, learning disability, and substance abuse (20 C.F.R.
§§ 404.1520(c)).

---

[10]The ALJ's rationale, which was interspersed throughout the findings, is omitted
from this recitation.

4. The claimant has not developed any new impairments since November 1, 2003, the date the claimant's disability ended. The claimant's severe impairments were the same with the exception of chronic obstructive pulmonary disease.

5. Beginning November 1, 2003, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(f)(2)).

6. Medical improvement occurred as of November 1, 2003, the date claimant's disability ended (20 C.F.R. §§ 404.1594(b)(1)).

7. The medical improvement was related to claimant's ability to work because there was an increase in the claimant's residual functional capacity (20 C.F.R. §§ 404.1594(b)(4)(i)).

8. Beginning on November 1, 2003, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that he could sit for 20 to 30 minutes and stand for 20 to 30 minutes consistently on an alternate basis for 8 hours a day, 5 days a week; he would need to avoid heights and hazardous machinery; he required jobs with no prolonged climbing, ropes, ladders and like devices. The claimant was limited to simple, routine, unskilled, SVP 1-2 jobs with low stress, low concentration, and low memory; no production rate pace work; jobs with little interaction with the public, co-workers, and supervisors; jobs working with things and not people; and jobs with little decision making, changes in the work setting, or judgment.

9. The claimant remains unable to perform past relevant work (20 C.F.R. § 404.1565 and 416.965).

10. On November 1, 2003 the claimant was an individual closely approaching advanced age (20 C.F.R. § 404.1563). On April 17, 2006, claimant's age category changed to an individual of advance age (20 C.F.R. § 404.1563).

11. The claimant's education level did not change (20 C.F.R. § 404.1564).

12. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

13

13. From November 1, 2003 through April 17, 2006, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. § 404.1560(c) and 404.1566).

14. As of April 17, 2006, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. § 404.1560(c) and 404.1566).

15. The claimant was not under a disability, as defined in the Social Security Act, from November 1, 2003 through April 17, 2006, but became disabled on April 17, 2006, the date the claimant's age category changed (20 C.F.R. § 404.1594(g).

(*Id.* at 476-87)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are

conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g),

1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether

"substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806

F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may

not undertake a de novo review of the ALJ's decision and may not re-weigh the

evidence of record. *See id.* In other words, even if the reviewing court would have

decided the case differently, the ALJ's decision must be affirmed if it is supported by

substantial evidence. *See id.* at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the

evidence, but more than a mere scintilla of evidence. As the United States Supreme

Court has noted, substantial evidence "does not mean a large or significant amount of

14

"evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his

15

conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful

16

work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(1) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. See 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC

17

to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v . Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to h[er] past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On January 19, 2012, the ALJ found that plaintiff was not under a disability within the meaning of the Act from November 1, 2003 to April 17, 2006 ("the relevant time period"). The ALJ concluded that, despite plaintiff's severe impairments (degenerative

18

disc disease, bilateral osteoarthritis of the hips with a July 2003 total left hip replacement, bipolar disorder, attention deficit hyperactivity disorder, learning disability, and substance abuse), as of November 1, 2003, he had the residual functional capacity to perform light work except that he could sit for 20 to 30 minutes and stand for 20 to 30 minutes consistently on an alternate basis for 8 hours a day, 5 days a week; he would need to avoid heights and hazardous machinery; he required jobs with no prolonged climbing, ropes, ladders and like devices. The claimant was limited to simple, routine, unskilled, SVP 1-2 jobs with low stress, low concentration, and low memory; no production rate pace work; jobs with little interaction with the public, co-workers, and supervisors; jobs working with things and not people; and jobs with little decision making, changes in the work setting, or judgment. After considering the VE's testimony, the ALJ concluded that, while plaintiff could no longer perform his past work, there were a significant number of other jobs in the national economy, including inspector, filler, and hand bander at the light exertional level, as well as dial marker, bench hand, and table worker at the sedentary exertional level.

Plaintiff contends that the ALJ erred in finding that his COPD was no longer a severe impairment; finding medical improvement with respect to his bilateral hip impairment; and finding that plaintiff could perform a range of light, not sedentary work. Defendant disagrees and contends that substantial evidence supports the ALJ's decision that plaintiff was not disabled under the Act from November 1, 2003 to April 17, 2006.

### 1. Chronic obstructive pulmonary disease

Plaintiff argues that the medical evidence does not support the finding that his

19

COPD was no longer a severe impairment as of November 1, 2003. The ALJ found

that plaintiff's primary care physician treated his COPD through June 2004, after which

the VA treated plaintiff. The ALJ cited the medical records reflecting that plaintiff's

respiratory impairment was under control with medication, no hospitalizations were

required, and a pulmonary function test in January 2005 confirmed mild obstructive

disease. The ALJ noted that plaintiff continued smoking and did not testify as to his

pulmonary symptoms at an administrative hearing in 2011.

A "severe" impairment is one that significantly limits a claimant's physical or

mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).

Examples of basic physical work activities include functions like walking, sitting, lifting,

pushing, pulling, reaching, carrying, or handling. 20 C.F.R. §§ 404.1521, 416.921. The

evidence cited by the ALJ supports a conclusion that plaintiff's COPD was not a

"severe" impairment as of November 1, 2003.

Plaintiff argues that the ALJ should have compared plaintiff's medical condition

before and after November 1, 2003, in order to find "medical improvement." 20 C.F.R.

§§ 404.1594(b)(7). Medical improvement must be proven by "changes (improvement)

in the symptoms, signs and/or laboratory findings associated with [the claimant's]

impairment." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(I). Plaintiff points to the fact

that a prior pulmonary function study had shown similar values (no medical source

compared the two tests), thus there was no significant medical changes beginning on

November 1, 2003. Nor were there any changes to his chest x-rays.[11] The ALJ's

_____

[11]While plaintiff admits that his condition after April 17, 2006 is not at issue,
plaintiff refers to his testimony on August 23, 2006 regarding his pulmonary problems at

findings indicate that he concluded that plaintiff's COPD was "under control," based on the signs described in the cited medical records for the relevant time period.  The court concludes that the ALJ did not err in finding that plaintiff's COPD was no longer severe as of November 1, 2003.[12, 13]

## 2. Bilateral hip impairment

Plaintiff argues that the ALJ erred in finding medical improvement of his bilateral hip impairment, as the ALJ focused only on a short period of time immediately following plaintiff's surgery and did not take into account his continued reports of pain.  To support his argument that his hip pain did not improve, plaintiff points to various complaints throughout the record.[14]  For example, plaintiff cites to his report to Dr. Aviado, that he was doing "fairly well," on August 11, 2003, less than a month after his hip replacement on July 22, 2003.  Plaintiff also references the pain relief medications

---

that time.  Plaintiff's testimony as to his condition in August of 2006 is not dispositive as to his condition during the relevant time period.

[12]Moreover, regardless of whether the ALJ erred in finding that plaintiff's COPD was no longer severe, the ALJ found in plaintiff's favor at that step (holding that he did have severe impairments), so any such error was harmless. *See Salles v. Comm'r of Social Security*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007) ("Because the ALJ found in Salles' favor at Step Two, even if he had erroneously concluded that some of [plaintiff's] other impairments were non-severe, any error was harmless.") (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).

[13]Additionally, defendant notes that two of the jobs identified by the VE – inspector and hand bander – involved no atmospheric conditions; therefore, plaintiff could have performed these jobs regardless of any functional restrictions stemming from his COPD. *See* DICOT 727.687-062, 1991 WL 679674 Inspector; DICOT 920.687-026, 1991 WL 687967, Bander, Hand (both stating that atmospheric conditions are not present, i.e., activity or condition does not exist).

[14]Plaintiff does not separate out the opinions of his orthopedist from his primary care physician and the VA, nor does he provide the dates of his chosen complaints.

he was taking in August 2006, however, this is not the relevant time period.

An ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects. *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ ... may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). Opinions of a treating physician are entitled to controlling weight only when they are well-supported and not inconsistent with other substantial evidence in the record. *See Hall V. Commissioner of Soc. Sec.*, 218 F. App'x 212, 215 (3d Cir. 2007) (unpublished) (affirming ALJ's decision to give little weight to treating physician's reports because of "internal inconsistencies in various reports and treatment notes ... as well as other contradictory medical evidence"); *Fargnoli*, 247 F.3d at 43.

The ALJ based his conclusion of medical improvement on Dr. Choy's evaluations of plaintiff following his left hip replacement on July 22, 2003. Dr. Choy's treatment notes indicate plaintiff was no longer taking narcotic pain medication as of November 21, 2003 and was doing "very well" in June 2004. The ALJ explained that plaintiff still experienced some pain, causing some limitation to his standing and walking. The ALJ also discussed plaintiff's continued reports of pain to the VA and Dr. Aviado, including plaintiff's reported pain in his left low back, hip, and leg in January 2005. While plaintiff was given a cane in August 2005, the ALJ noted that there is no mention of plaintiff using the cane when he returned to the VA in October 2005 for a back brace. Plaintiff

admitted that he was not doing recommended back exercises.[15] Plaintiff returned to the VA in February 2006 after a car accident, complaining of lower back pain. The ALJ concluded that plaintiff's reports regarding the intensity, persistence and limiting effects of his symptoms were not credible for the relevant time period, when compared to the medical evidence.

The ALJ detailed his reasons for affording little weight to Dr. Aviado's opinion regarding plaintiff's inability to work in March 2004: (1) it was not consistent with the opinion of the state agency reviewing consultant who opined that plaintiff could perform a range of light work based on a review of the evidence; (2) it was not supported by Dr. Aviado's contemporaneous treatment notes which did not document the severity of symptoms or examination findings to support his conclusion; (3) the form Dr. Aviado completed did not explain his conclusions or refer to any objective tests; (4) Dr. Aviado was not a specialist in orthopedics or rehabilitative medicine, and Dr. Choy, plaintiff's treating orthopedist, did not note any work restrictions; and (5) opinions regarding a claimant's ability to work are administrative findings reserved to the Commissioner.

After a careful review of the evidence of record and considering plaintiff's and defendant's positions, the court finds that the ALJ did not err in giving less weight to the opinions of Dr. Aviado. Moreover, the court concludes that substantial evidence supports the ALJ's decision that plaintiff's bilateral hip impairment was medically

---

[15]The ALJ appropriately made reference to plaintiff's noncompliance with medical care and treatment (i.e., the failure to stop smoking and stopping or refusing to take medication). To obtain medical benefits, a claimant "must follow treatment prescribed by ... [a] physician if ... [that] treatment can restore ... [the claimant's] ability to work." 20 C.F.R. § 404.1530.

23

improved as of November 1, 2003.

### 3. Type of work

Plaintiff argues that the ALJ erred in finding that plaintiff could perform a range of light, not sedentary work. Plaintiff argues that the ALJ gave "considerable weight" to Dr. Fried's opinion, but then ignored crucial restrictions therein without explanation, including the standing and walking limitations, reaching occasionally, and performing postural activities. Further, the ALJ misrepresented plaintiff's testimony regarding the amount of weight he could lift or carry. The ALJ's finding of light work is contradicted by plaintiff's use of a cane.

The ALJ stated that, based upon the medical evidence as of November 2003, a limitation to lifting twenty pounds occasionally and ten pounds frequently was reasonable. The ALJ concluded this was consistent with plaintiff's testimony at the 2010 hearing, of being able to lift twenty pounds and his testimony at the 2006 hearing of lifting up to twenty-five pounds.[16] The ALJ then explained that the medical evidence and plaintiff's subjective complaints supported additional limitations in sitting and standing, i.e., standing and siting only twenty to thirty minutes at a time. The ALJ

---

[16]The court notes that the testimony reads:

> Q. What have they said to you about how much you should or should not lift?
> A. Basically they kind of left it up to me but no more than 25 pounds, that's for sure. On a constant lift. Although I have tried to lift a few different things around the house, and from time-to-time I've pulled a muscle or I've heard my prosthesis snap and pop.
> Q. What would you say you 're comfortable with? . . .
> A. Ten pounds.

24

concluded that the medical evidence of record did not support greater physical restrictions as of November 2003.

The ALJ gave significant weight to the March 2005 state agency physical assessment indicating a capacity for light work, consistent with the residual functional capacity beginning November 1, 2003. The state agency found that the record supported limiting plaintiff to lifting twenty pounds occasionally and ten pounds frequently. The ALJ explained that the medical evidence supported additional limitations on sitting and standing, as discussed above.

The ALJ gave considerable weight to Dr. Fried's opinion in November 2009, which stated that plaintiff could lift twenty pounds occasionally and ten pounds frequently, stating that this was consistent with the medical evidence beginning in November 2003. The ALJ gave less weight to Dr. Fried's opinion regarding plaintiff's ability to sit eight hours a day, stand for two hours a day and walk for one hour a day, as the medical evidence supported the limitations discussed by the ALJ above.

The ALJ indicated that he did not find the plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms as of November 1, 2003 credible, to the extent that they were inconsistent with the residual functional capacity assessment determined from the medical evidence. An ALJ must give great weight to a claimant's testimony only "when this testimony is supported by competent medical evidence," and an ALJ may "reject such claims if he does not find them credible." *Schaudeck v. Commissioner of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). The ALJ "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not fully credible." *Baerga v. Richardson*, 500 F.2d 309, 312 (3d

25

Cir. 1974). The ALJ took into account plaintiff's complaints, however, the ALJ assigned

more weight to Dr. Choy's treatment notes as plaintiff's orthopaedic specialist, than to

Dr. Aviado's as plaintiff's primary care physician.

The ALJ also noted that while plaintiff was given a cane in August 2005, there is

no mention of his using the cane when he returned to the VA in October 2005 for a

back brace.[17] That plaintiff's sitting and standing requirements total four hours of each

is not dispositive. See Santiago v. Barnhart, 367 F. Supp. 2d 728, 733 (E.D. Pa. 2005)

(stating that "[t]here is nothing oxymoronic in finding that a plaintiff can perform a limited

range of light work. Such a finding is appropriate where, as here, the evidence shows

that the plaintiff can perform some, though not all, of the exertional requirements of a

particular range.")

The ALJ considered all the relevant evidence and adequately discussed the

bases for his RFC determination in his findings and evaluation of the evidence. The

court concludes that a careful review of the entire record provides substantial evidence,

sufficient to support the ALJ's finding that plaintiff could perform a limited range of light

work and that jobs existed in significant numbers in the national economy that he could

have performed, and that he was not disabled from November 1, 2003 to April 17,

2006.

---

[17]Plaintiff has not before this motion practice alleged an impairment reasonably
causing reaching restrictions or received treatment for such an impairment. Further, at
least two of the jobs identified by the VE did not involve any postural activities. See
DICOT 727.687-062, 1991 WL 679674, Inspector; DICOT 780.684-066, 1991 WL
680790, Filler (both stating that postural activities like climbing, balancing, stooping,
kneeling, crouching, and crawling are not present, i.e., activity or condition does not
exist).

## IV. CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted. An appropriate order shall issue.